Okay. Counsel, state your appearance. Good afternoon. My name is Eric Johnson. I represent Pacific Northwest Generating Cooperative. I'm one of the, my client's one of the three petitioners. BPA relies on two principal arguments in this case and they're both arguments that result is the exception swallowing the rule if you accept those arguments. First one relates to the standard of review and I'd like to address that portion first. I'm thinking of the statement that the court wrote at pages 860 and 61 in the PNGC opinion. I'm not going to try to walk through each of the steps so that you know this law better than I do. The point I want to focus on is the issue of when the court owes BPA any special deference. I believe the case law indicates that there must be a void in the statutory regime before the agency has discretion to attempt to fill it with its own exercise of judgment. As I read these cases though, I believe and I urge you to consider that this void may not be filled by just anything the Congress is responsible for establishing the mandates that the agency must follow and defining for the agency what its business interests are. If the agency's action is inconsistent or violates those mandates, then they are subject to judicial review. If there is a gap, then the agency may have deference but the deference does not swallow these mandates. They remain in place. The agency does not get... But it also has ordinary Chevron deference, I assume, with regard to the mandates, i.e. interpreting them. I'm sorry, Your Honor. I didn't hear the first part. It also has ordinary Chevron deference with regard to the mandates. Yes, it does. But I'm focusing... But you don't want to get specific, too. It's a little airy right now. You're speaking a little bit, a little in the sky, so it would be helpful to know exactly what you're referring to. Okay. What I'm trying to... Let me see if I can help focus because we've all looked at this case and maybe it will be helpful if some of us individually... I'm not speaking for anybody else, but from my own standpoint, on 838G, it provides that the BPA is to set rates. And we drew upon that section and what I want to direct your attention to is the part that says that the rates shall be fixed and established, one, with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers, consistent with sound business principles. Now, there's a debate about BPA thinks that sound business principles is not appropriate, but taking just the language of the statute, assuming that, as we did, in fact, I think, hold in our opinion, that that statute does set parameters and discretion in setting rates, what is it that you're relying on? Where did they go wrong, in a nutshell, assuming that we have, and please do assume, that we have authority to, under the statute, review with some degree of deference. We'll debate about that, I suppose, but I just want to know where do you think the failings are on this amendment that BPA committed? Look, focus in on that language. What did they fail to do? I'm going to shift out of the argument I had intended to address second because I think that's where your question goes. The agency has done the same thing it did last time for the same lack of good reasons. The only thing that's different is they calculated a rate under Section 7c of the Northwest Power Act, a rate directive that applies to the industrial power rates, and made the benefits against that standard. They calculated the benefits against that standard. We believe that you, that the agency is not immune from judicial review simply because it calculates benefits against a rate that it decides under Section 7c. It's not a safe harbor. The mandates that the agency has under the Project Act, the Transmission Act, and the Northwest Power Act, and also the Flood Control Act, survive. The agency's decision whether to offer a contract in the first instance is subject to those mandates. Now, it seems to me there are two maybe distinctions in terms of, aside from the IP rate, which is a distinction. One is that this is a very short-term contract designed essentially to deal with what they regarded as an emergency and there's going to be another one and at that point you can worry about perhaps, at least one possibility is do we need to take into account in determining the sound business reasons that they felt they had to act in an exegesis and that essentially driving these companies out of business precipitously wasn't necessarily a hot idea. That's one possibility. And the second possibility is that they did give a bunch of more articulated reasons in the Columbia Falls document, which I know there's a dispute about whether we should be continuing or considering, which deal with non-monetary assertive business reasons. So those are the two things that would be helpful to me for you to address. I'll try to address those quickly, I'm down to a minute. With regard to exigency, no matter when the court rules, if it rules against the interests of ALCOA, there's going to be an exigency. It's just the nature of the beast. These folks are, like my clients, rate payers experiencing difficulty in the economy. I have service areas where the unemployment rate is over 20%. We care about the cost of electricity every bit as much as ALCOA does. Our jobs are as important as theirs are. The rationale that the agency put forth after executing the ALCOA contract should not be considered by the court. It is a If you do consider it, you can look at each one of the reasons that they've put forth. We've addressed these in our brief. Every one of them fails. I have run out of time. I'm going to defer now to Ms. Davison. Thank you. Good afternoon. My name is Melinda Davison. I'm here on behalf of the to answer the two questions that have been posed thus far. The first one is, what are the failings that we see with the ALCOA amendment? I think that the first failing that we see is that the record is completely void of any explanation as to what BPA was trying to do and how to explain and justify this amendment. There is one letter that was issued at the time that the amendment was made public for three days. There is a later attempt at explanation and given the timing of all this, it seems to me it would be sort of silly to not pay attention to their attempt at a longer explanation. And the longer explanation, as I understand it, does tell us something about the history of the relationship between the aluminum companies and BPA and suggests that in some longer range view, there was arguably a detriment to losing those companies and that's what we're looking at. Now, suppose this is what's troubling me. Even that was fairly summary. Suppose that we go through another longer proceedings, a longer contract, and that is fleshed out in great detail as to what the ins and outs of that relationship have been and why there's any reason to believe that keeping the companies afloat is to the long run interest of BPA. Would that be a sound business reason? I'm not sure that it depends on, I'm not sure I can answer that in a vacuum. I think it depends on the particular facts and circumstances that are before us. But to get back to the basic question of this so-called emergency that this had to issue immediately, with all due respect, Your Honor, we don't buy that. And the reason we don't buy that is it's very clear in this record that Alcoa had secured its power supply for this entire time period. They had already purchased power to operate during the time period of the Alcoa Amendment. There was no emergency. I thought the emergency wasn't going to afford to pay for it. I'm sorry. I'm sorry. But Alcoa, as BPA says in their opening brief, is one of the largest companies in the world. This is a major, major multinational company. I do not buy for a second, and there is absolutely not one shred of evidence in this record that suggests that Alcoa could not pay for its power bills to keep the Alcoa mill operating. There's nothing in the record to support that at all. That is just pure speculation that came in after the fact. I think if we look at what was going on, the reason this amendment got put together, and this is an amendment that's worth tens of millions of dollars in such a short period of time, is that this is... Thirty-two, isn't it? Yes, that's right, Your Honor, is that this is a situation where basically BPA went through the motions, said, OK, we're going to create the IP equivalent, not the IP rate, but the equivalent IP rate. And then the agreement is basically the same as the one that was found to be invalid by this court in the original PNGC case. And that's what's going on here. It's certainly briefed by us in what we think are the flaws of the equivalent IP rate. So we think that there was not enough process, there is not enough explanation, there is a failure to meet the business... Is it your position that it would be all right for a rate that they set to increase the cost on non-DSI consumers, but they would have to justify it? We believe that based on the opinion that was issued in the first PNGC case, and we believe that opinion to be correct, that the court said that there are instances in which it is perfectly legal and appropriate for BPA to provide service to the DSIs and for those costs to be passed on to customers that... So your complaint then is there's no justification? There is one sentence. Yeah, OK. There's one sentence. That's right. I'm out of time. Thank you. Good afternoon, Your Honors. Mark Thompson for the Public Power Council. Given the alignment of interest, I would actually like to reserve my time for rebuttal. I'm addressing you earlier than I thought I might. Good afternoon. I'm Mike Dotton. I'm attorney for Intelco, served at the Ferndale, and the party is Alcoa. I have two points to make today. The first is if PNGCs and PPCs' contentions are correct about the meaning of Section 9 of the Transmission System Act, then a rate to any party that failed to recover the opportunity cost of power would not be consistent with their own business principles, because that standard applies to all parties. It's a general rate-making standard. But we just heard, and it does have to be the case, that that's not the case. It's not the case that any contract that doesn't cover its incremental cost is not consensual in some business judgments. And nothing in the prior opinion says that, and I don't know why you're assuming that. I agree with you, but the contention that is before you from the petitioners in this case... No, she just said no. I just asked her. We just asked her. Well, this petitioner does, and I think PNGC disagrees in their brief. But I'm not trying to raise a straw man here. I'm trying to deal with what I think is a serious argument that there is no circumstance under which Bonneville can exercise its discretion to purchase power if the cost of that power exceeded the rate that they would get from Alcoa. And I think that's inconsistent. Unless there were some statutory barrier to spreading the cost, one would assume that a sound business judgment rule would not preclude that. I mean, if you just look at a business judgment corporate rule, as long as you can recover your costs, then there are circumstances in which it would be a sound business judgment. So the real question is whether there is a statutory barrier to that recovery. And I don't really understand that argument to be made on an across the board basis. I agree with you, Your Honor, that Section 9 of the Transmission System Act has always been interpreted to mean what's the size of the pie. The size of the pie has to be large enough to permit Bonneville to repay the federal investment. It's small enough to be lowest possible rates consistent with sound business principles. Is there any obligation for BPA to sell power to Alcoa? I thought there was until PNGC 1 came out, Your Honor, but Alcoa has accepted this Court's holding that there's no obligation, but Bonneville has the discretion. If there's no obligation and BPA sells power and it's going to be a losing proposition, how could that possibly be sound business practice? Well, it wouldn't be with respect to any growing load. And here's the point that I was trying to make a little bit earlier. It wouldn't be with respect to any purchase of power because in today's world, power costs more than the average cost of power to Bonneville. The preference customer loads are growing. Bonneville is acquiring power to serve preference customers. ESI loads have gone from 3,000 average megawatts to about say roughly 600 average megawatts during that same time. So the result, really, I think if you accepted the proposition that sound business principles means that Bonneville can't buy high and sell melded is that the same standard would prohibit the preference customers being treated in the same way. And I think that that proposition proves too much. I agree with you. But there's still a problem. And the problem is, at least one problem is that the reason the sound business judgment explanations or the explanation for the sound business or otherwise that BPA has given for doing this seem to assume that they're selling power, but they're not selling power. They're selling, they're called monetizing. So the advantages that they have identified, which include reserves and low purchases and so on, are happening. The reserves are happening. Bonneville retains the right under its transmission agreement with Alcoa to interrupt for the benefit of the system. And we are in contract negotiations now and Bonneville just completed a rate case by which it established what the reserves would be. So I think there are going to be you can't be reserved. So if they're not selling power, if you have if you have the right to interrupt the customer, you can take the power that you're buying from other people. Yes, that's that's exactly what they have the right to do under the transmission agreement. Your Honor. Can I go back to something you said where you said it proves too much the preference customers, the preference, according to the case law, is the preference to get power, not the preference in rate. Yes, that's right. So what do they pay? I mean, Bonneville can't buy high and sell low and pay the government back the costs of the Bonneville power system. If they've got to charge the customers that mark a rate that at least their costs. That's correct. In the Golden Northwest case, the court recognized that that was taking place under the old contracts. And I don't try and make too much of that because I know that it only applied to the initial contracts. But nonetheless, the law remains the same. And what the court said is completely. Declined to decide if having already been decided, the question we're facing, which is whether the sale itself was a problem. And if you can sell if you can sell to these people, then you can distribute the cost. But that didn't answer the question whether you can sell. I think this court decided that this panel decided that that Bonneville had the discretion to make a sale of power. And then the question I think that all the parties are asking is what at what price. And I think and I think the answer appears in Section 7B and 7C of the Northwest Power Act, which Section six of the Northwest Power Act dealt with who can get power and under what conditions. Section seven then says when Bonneville provides power, what it is, what is it obligated to charge? And we think that this court correctly decided that the appropriate rate for Alcoa is the IP rate. The problem is. And and the court said, are you arguing that I mean, they're using the safe harbor language, but essentially as long as they're selling to you as a DSI at the IP rate, if that's what they were doing, then it's all fine and there's no other inquiry. And that is, in fact, what Alcoa was Alcoa's preference. It wanted physical power. But well, even if the monetized rate, I mean, are you arguing that there's no further inquiry if it is selling to you as one of the DSIs, recognized DSIs and at the IP rate and let's put the monetization in it? That's it. There's no question. Other sound business judgment or other query to be made. Is that your so so long as the rate was appropriately adopted, your honor, and reviewed by the Federal Energy Regulatory Commission and when presented to this court was sustained. When is the IP rate set? When is it set? It's it's set in bondable rate proceedings and those take place about every two years. So then when Alcoa comes in to with a request for power, there is an extent IP rate. That's correct. And at least as I read 838 G, the rate has to factor in what I read out at the beginning of my first question, which is and that includes the business sound business principles. Right. Well, in the city of Santa Clara case, this court has held that the that the there's no law to apply that those standards are not. Come on. How is it done? I mean, whether there's standards or not, we'll debate that. But the the statute itself says has to be with a view to encouraging the widest possible diversified use, the lowest lowest possible race to consumers consistent with sound business principles. OK, so in the rate setting, that's a rate setting mandate. It is. It is a rate setting mandate from Section 9 of the Transmission System Act. The far more specific rate setting mandates are found in Section 7B and 7C of the Northwest Power Act, which were designed to take that general what I described as a pie and to tell and to tell Bonneville how it was obligated to divide up that pie between its customers. So in response to you, Judge Burson, I would say that so long as Bonneville had discretion or an obligation to provide power to a customer and then designed its rates in a way that is whether or not those rates are consistent with sound business principles and provide for the widest. The question of the sale, in other words, knowing that you have to sell it at X rate, at least offered at that rate. Your argument is that it is always permissible and that there's no court review at all of the IP rate. I suppose it is effectively. I suppose you could hypothesize a circumstance that doesn't exist here where the sale of power would be so outrageous that Bonneville couldn't meet the requirements for preference customers. And you had preference customers whose loads weren't being met while industrial customers' loads were being met. Then I think you could say, yeah, that's a circumstance where there may be some law to apply because it's inconsistent with the preference clause. But in this instance, Your Honor, if you accept the petitioner's view, you would say there can't really be any discretion to provide power because the only price that you could charge Alcoa for that isn't the 7C rate. It's whatever the market price was. Well, then you wouldn't have a sale. Alcoa would simply go out and buy the power of the market. I don't think that's correct. You could charge the IP rate if you think there are other reasons to do so. If the IP rate is lower than the market rate. For example, if Alcoa is going to take, and this is some of the reasons that BPA talked about, that Alcoa takes power at times, at off times when the residential community isn't using it, that they take a certain non-sculptured type of power, whatever that is. But the BPA gave reasons as to why they wanted to keep Alcoa. Here's my question. Say Alcoa's plant, the smelting plant, were going to be shut down. And they said, we're going to shut this plant down in the next nine months. And we're never going to reopen it. And BPA says, okay, well, we're still going to give you this. We're going to still give you cash for the power. Does that make any business sense at all? It does if you receive some benefit and the reserve benefits and the. What would that be? Reserve benefits, jobs, especially right now, jobs within the region. Bonneville maybe wanted a balance. How do you achieve widest diversified use of power? Well, you would want to have there to be direct service industries in addition to industries served by preference customers. But if the industry were going to go out of business for other reasons, how is that going to spread the diverse use of power? Well, if they went out of business, it wouldn't. If you prevented them from going out of business, it would. Well, is there anything in the record before us that shows that there's some equivalent benefit or arguably equivalent benefit by keeping the smelting plant going? In other words, that the jobs they're going to say, I thought there was like someone in one of the papers said there's about 170 jobs. Five hundred. Well, at Entelco, about 500 jobs. That somehow that monetarily was going to benefit or come close to benefiting BPA to the tune of $32 million? It would meet an objective of the Northwest Power Act in providing. If there's something in the record. I mean, if they said, look, you'll save 500 jobs. These people won't lose their houses. These people use electricity. They're going to buy electricity. You're going to make money on these people. They're going to spend money at the local stores. The stores use electricity. If there's something in the record to show that, that's what I'm asking. Is there anything or in that letter or in the subsequent letter? Well, the problem is that Bonneville never had the opportunity to create the record on remit. That's why we're all here, I think, struggling in parties trying to supplement the record. Why did they not? I mean, just because of the exigency of the time? The exigency. Is that a question? You raised a whole other issue in your brief, spent most of your time on it. I see you're not arguing it. I think that's probably a wise move, but have you abandoned it? We have not abandoned the claim that if the court addresses the question of injury, that it should address the question of injury in the context of the court's opinion in PNGC 1 and. Well, you didn't file a petition for a hearing either. I mean, I thought what you were saying was sort of intriguing, but you never asked us to do anything with our earlier opinion with regard to it. And now you seem to be raising it in what seems quite unorthodox fashion, i.e. you didn't file a petition yourself, but you're attacking the BPA's decision. We, and the reason for that, Your Honor, is that we believe the appropriate place to create a record is on remand before Bonneville Power Administration. You're essentially saying you're not really trying to attack this agreement or the earlier opinion, but instead it has something to do with whether you think you should get a refund or not get a refund. That's correct. That's fine, but that means it's not in this case, and you're agreeing it's not in this case. I agree that if the court decides not to deal with the question of damages in this case, which I think is appropriate, then it isn't in this case because. Who ever asked us to deal with damages in this case? The petitioner, PNGC, is asking you to remand with instructions to BPA to collect the monetary benefit that was paid to Alcoa. That's the remedy they've asked for, Your Honor. Okay. You've been helpful, but you're over time. I am. Thank you, Your Honor. Okay. Good afternoon. May it please the court. My name is Courtney Olive, representing Respondent Bonneville Power Administration. It's crucial to remember that this case is about a nine-month transitional measure intended as a stopgap means while BPA and the parties figure out what to do about a lot of these longer-term DSI service issues. Now, what BPA did in this amendment is a very narrow, straightforward response in short order to the court's opinion. BPA substituted the rate, which as the court identified in the PNGC decision was a central deficiency with the original contract, the wrong rate. BPA substituted the proper statutorily authorized rate, the IP rate. Well, a different IP rate than the previously published IP rate. We use what is called an equivalent IP. You're right. The reason we use that equivalent IP is because this amendment was only for nine months. The published IP rate is averaged typically on an annual basis. We didn't say you could use the equivalent IP rate. We said the IP rate, and you had a published IP rate. So, no, you got to admit, you deviated a little bit. Well, how does an IP, I thought, and I haven't looked at this, but I thought your explanation was, and I'm asking if this is true, that the IP rate is not actually one rate. It's a different rate for each month or each week or something? Yeah, absolutely. There was that website link that I think IC&U initially provided. We cited it in a footnote as well. It shows that vulnerable rates are always varying by the time of day. With people, there's a greater demand for power during the middle of the day than there is at 2 o'clock in the morning. So, they vary by time of day. They vary by time of year, and that has to do with heating and cooling costs and so forth. So, when parties enter into contracts like this up front, they use an annual average typically, okay? And that's the way that you. And you didn't have a full year, so you did a month. You're saying you just used nine months. Exactly. The original. September to December. I think the period was December from when the opinion came out. You didn't use September to December. Oh, yes, you're right. We did not use those months. And the original contract had been written on an annual average basis, and since three months of that fiscal year had already passed, we just used the rest of the fiscal year to finish it out as quickly as possible. So, that's the reason for using this, what we've called equivalent IP rate. It is a little odd, though, because ordinarily, an annual rate's an annual rate at whatever point during the year you buy it, right? Not necessarily. Have you ever used the equivalent? We've never had a. Have you ever used the equivalent IP rate and say someone only wants a six-month contract? No, no. This was a response to the court's opinion. To do it just for you guys. To do this immediately and to quickly respond. So, we've, no, we've never had to calculate an equivalent IP. So, based on the facts given, we did what the agency thought was the most appropriate and reasonable thing to do. Is your ultimate position, to get a little further into it, the same as Alcoa's, is that if you are selling to a DSI at an IP rate, that's it, it's okay? Yep. That's our first ultimate position. The court's opinion said that the problem with the contracts was that the rate was below both market and IP. And by using that rate of Vonneble's choosing, instead of following the specific statutory directives to set the IP rate and use it, by doing that, Vonneble had violated his own. Why don't you put the, and let's assume maybe that's true, and I don't know if it is or isn't, but let's say maybe it's true, if you were selling power. But you're not selling power. You're doing this other thing, right? And selling power has various, you know, business benefits as you lay out in your explanation that not selling power doesn't have. So, why, once you're going to this odd other system, which we said you could do, but why doesn't that lead to more scrutiny in the sense that you're set up to be a power company. Now you're not being a power company. You're giving money away and not getting the benefits of what you get from selling it. So, why doesn't that lead to more scrutiny with regards to whether a sound business principles or whatever would allow this? The reason it doesn't lead to more scrutiny is because in the court's opinion, you went through and described that it's reasonable for Vonneble to conclude that it has the authority to monetize, generally. And. Well, it didn't say that. It said under some circumstances, under a pro, yeah. Right, right. When you want to minimize risk and have. Not the ones that were around then and not only because of the IP, right? Right, but what the court said is the circumstances weren't valid then because Vonneble was using the wrong rate. Those, Vonneble's just. But it was a list of three reasons and that wasn't the only one. The, no, there were three justifications Vonneble had given for the transaction. He said were not so. And the court said those justifications aren't sufficient to serve these industries at the wrong rate. And that there was language in the opinion to the effect that Vonneble has subsidized the DSIs beyond what it is obligated to do. So, implicit in the court's language was a recognition that the IP rate is a cost-based rate. You can say that it's going to forego some revenues by not selling it at what everybody else is selling out market. But that is what we do. We sell at cost. We do not maximize revenues. But suppose, for example, and the hypothetical that was given before. I mean, the preference customers do have a preference at least to buy. So, if you were selling so much to the DSIs that the preference companies couldn't, customers couldn't buy, that would be a problem. Potentially, but that's not at all what's happening here. There's no problem with insufficiency of power. Just in December, the preference customers all signed 20-year contracts to obligate Vonneble. Suppose even on a short, in a long-term basis, it's true that if you sell at an IP rate, you should be able to recover across the entire base of rate payers, including the preferred customers and the DSIs, at least your cost. But in the short run, that isn't true. It's almost certainly not true here, right? I mean, isn't it true that you're not going to be able to go back to the preferred customers and have them bear the rate for this time period? So, you're going to lose money. You're just going to lose money. Is that right? In the short run. The court has told us that what we need to do is, excuse me, the court has said that we have authority to allocate costs of serving the DSIs to various other rates, including the preference rate. That was the Golden Northwest opinion. Retroactively, though, over this nine-month period, when they already have a rate for this period? When the preferred customers already have a rate for this period? Are they going to be able to go and re-spread the rate? Well, Bonneville's cost recovery is in totality. So, it's not just a look at this one rate period or the next rate period. It's annual treasury payments. There's quite a involved and I'm But on a short-term basis, you're going to lose money, right? It's So, don't you have to take that into account? And, again, businesses make choices to lose money. But don't you have to explain it? Well, so, I think the focus is off here. In the short term, are we going to lose money by doing this? I don't agree that that's necessarily the case. Okay. Let's see if I can. Okay. Either I'm light years ahead and I don't think so, or I'm more likely I'm light years behind. Okay. I'm still trying to understand in this process, the general concept, which seems simple on its face, which doesn't seem simple in application, is that BPA sets rates. The rate general statute, as Alcoa calls it, has some criteria. Okay. And the criteria suggest, and going back and parsing our own opinion, I'm trying to put myself in your shoes to figure out how you interpreted what we had in mind. And sometimes, going back, I'm not even sure we know, at least, you know, we do know at the time. But the problem is, is that now we have a specific situation. And I'm trying to understand how one applies it in this circumstance, where if you look at what you're doing, you have diversified electric power. That diversifies the consumer base. But if you undertake to subsidize one part of the consumer base, it was clear in our first, in our opinion, that we understood and that you were agreeing that somebody's going to wind up paying for it, and it was the preferred customers. If the DSIs get a, some subsidization, that's going to come out. So that, of their pocket, so the lowest possible rates to consumers, okay, the consumers generally, isn't that not correct? So what you're sitting there as a rate making, or as a rate setting agency, is you're balancing these. And you're saying, it's in our interest as a provider under the statute to engage in this kind of a monetized contract, which will shift costs onto the co-ops and the others. But it's in the general good overall, which is consistent with our mandate. And what the theme, I just want to come back and say, one of the big frustrations in this case, at least from a judicial standpoint, is we don't see a clear explanation of, you know, cost benefit analysis. It's, they're general statements, but, you know, as counsel pointed out, there's one line in the letter, it just asserts it, and that's the problem we're having. Okay. The reason I'm having, okay, the reason you don't see much there is because 838G has never been used as these petitioners are suggesting that you use it. It has not been used as a rate setting criteria. Now, I know it goes through and has those three portions, but the first portion of it where it says, with a view to encouraging the widest possible diversified use of electric power, lowest possible rates to consumers, consistent with sound business principles, this court has numerous cases where that portion of the statute has been referred to as expanding bondholders' authority. It's not been used as a substantive measure against which to judge rates. It is a general measure. What is to be used is 7C, the IP rate directive, and the court spent a great deal of time in it. How can it be a one-way ratchet substantive rule? I mean, as I understand it, although you argued in your petition for re-hearing that the petitioners didn't raise 838G, you raised 838G as a justification for what you did. So, certainly, we have the authority to look at it because you raised it. And it can't possibly run in only one direction. I mean, you're arguing in the re-hearing and you're arguing that it has no law to apply. Well, if it has no law to apply, then there's no law to apply either to help you or to hurt you. And you've always relied on it, as you just said, as providing authority. And it doesn't seem to me that it can possibly run just one way. So, we have to remember the upshot of what they're arguing, okay? The upshot is by foregoing revenue and selling to these guys, somebody's going to have to pay a little bit higher rates. You're not out there just maximizing revenue, Bonneville. But that's not what the IP rate says to do. Congress told us to set this rate and the court's first PNGC decision identified that, recognized that that was the primary benefit the DSS got in the Northwest Power Act. They got an access to cost-based power through the IP rate. So, that's what we gave them. Now, if that, giving them access to that, if that somehow causes us to not have as much revenue to lower other people's rates, then that's fine by 838G because. That's really why I asked the question I asked before. That may well be, but as I, it seems to me that in a short-term sense, that isn't even going to happen here. You're simply going to lose money because you cannot, as I understand it, you can correct me if I'm wrong, go back and redo the rate for the present time period. That's a preferred, customers are paying. Is that correct? No, we can't unless we were remanded or something. Okay. So, it is possible. Therefore, at least in the short run, you're going to flat lose money. We're going to recover our costs in total, which is what we've been directed to do by the statute. Now, whether or not that. Are you going to do that? Through all the rates that we sell power for, the PF rate, the IP rate, all the rates. I just want to point the court to the California Energy Commission decision. And we did cite this in the petition for rehearing. We haven't dwelled on it in our brief, but it's really the exact same thing that's going on here. This is 909 F2nd 1298. There, this is ironic, the DSIs were arguing that we were foregoing revenues. And by so doing, they were ultimately going to have to pay higher rates because we hadn't maximized revenues with somebody else's rate. And they said that violates 838G. And the court specifically said, the statutes do not dictate that BPA always charge the lowest possible rates, cited 838G. And said, 838G directs that rates be set, quote, with a view to encouraging the lowest possible rates to consumers. The words, with a view to encouraging, do not constitute a statutory command that prices charged to consumers always be the lowest possible. Moreover, nearly every action by BPA has some arguable impact on future rates. So, this is a, the problem that I think the court is struggling with here is, this is a general statutory provision. And what petitioners are asking you to do is have the general trump specific, instead of the way we all know it's supposed to operate, which is 7C. I think the more nuanced question is, is there no, I mean, is there very deferential review or no review? I certainly think any review would be extremely deferential in some business judgment sense. But you're arguing for no review. No, that's not all we're arguing, Your Honor. We would, we would contend, we would, we will first argue that, that following the specific 7C IP rate directives ends the court's inquiry and you need not go further. The next argument is, it raises a very strong presumption that we have complied with sound business principles by selling at the rate Congress told us. I think I like that one better, so I'm going to open it up more. Okay. And the third thing is, in 25 plus years of the court reviewing Bonneville's rates, 838G has never been used as a substantive, specific mandate of, you know, well, wait a minute, you're supposed to maximize revenues so that the preference customers don't get hit. Well, that 838G starts off with the words, all electric power sales, PSI sales, preference sales, all of them. I want to see if I can poke my finger in here. Please. Without putting any electrics on. You know, my concern. I'm probably with you if you're talking about actually selling the power. But you're not selling the power, you're giving them money. And that, that to me is a world of difference. Why, let me, let me sort of take you through this just briefly. Why aren't you selling power to Alcoa? Because it puts us at risk selling power and if, if in year four or five of the contract we don't have enough, we have to go out on the market and be exposed to market. Understood. Okay. I mean, I think that, I understood and accept it. So, don't sell power to them. But why do you have to give them money? It's not like you had a contract and now you, you need to buy out of the contract and so you want to pay them what would be the equivalent of damages if you breached the contract. You have, from the way I see it, you have no obligation to sell them electricity in, in. That's right. 2007 for the five year period. And so if you have no obligation to sell them electricity, why do you have any, you don't have an obligation to give them money. So, why is it a sound business practice to give them money? What do you get for it? So, what we read from the court's opinion was that you, you have the authority to sell to them, but you're not obligated. Right. If you're going to sell to them and you're going to monetize it, you have to do it at the correct rate. And so, so that's. Together. So, I mean, we're together so far. Okay. Okay. So, we, we understood the court to be beyond the question of why are you selling it. It would make no sense to do it. Yeah, I don't think we, I think we went to the easier proposition there. That is, if you're going to do it, you have to do it at the IP rate. You're not doing it at the IP rate. And so, we don't have to reach the issue as to whether you can do it at all. I, I think the court did reach that issue though. It, it said it is reasonable for BPA to conclude that it has the authority to simply pay the difference between the valid contract rates and a higher market rate. Under some circumstances. Not blanketly. Explain what your rationale is. You have a, whether they've used this, it's been used substantively or not. The concept of making a discretionary decision to sell power, which is what you're in business for. And then to say, okay, we're not going to sell you the power. We're actually going to enter into a contract and subsidize your purchase of power elsewhere. We'll monetize it. Wasn't the 2007 agreement monetized right from the get-go? It was. Yeah. So, instead of entering into a power contract, I'm just trying to understand the business rationale for doing that. What, what are you achieving by doing it? Well, because as you say, it's unreviewable. As long as we do it at the IP rate, we're allowed to do it. And that's because that's the specific rate setting. Correct. Function. So, as long as we set the rate right for sale of power and then turn it into a monetization, that's what Congress had in mind. Yes. And, and we've read the court's opinion. We obviously recognize that the circumstances were not correct in that opinion. But we've read the court's opinion to say, what Bonneville has tried to do here is sell to the DSIs at a rate other than the one that it's statutorily authorized to sell at. And so, that's what's wrong with. That's because the debate was between whether you had to be at the IP rate or some lower rate, okay. We were, that was the question that was presented. Now we're at a point where we're, okay, now we're at the IP rate. And we're trying to understand how is it that EPA can go out and enter into a non-power delivery arrangement which ships, takes money from some consumers and ships it to Alcoa so it can go out and buy the power at its market cost with the EPA underwriting the IP component of it. Such that you're transferring money over to Alcoa to buy on the open market. So, what's the rationale for doing it? When you don't have to enter into the power. No, you don't have to sell them power in the first instance. So, what's in it for EPA to do that? There's no new rationale here because the court preserved the original contract. The court said we are specifically not invalidating this original contract. We are invalidating the monetary benefit provisions of it. Right, exactly. So, that's why we want to know what is the reason for going back and monetizing it again but at a different rate. And so, the same question persists. What's in it for EPA to do that? Well, and we read the court's opinion as approving the transaction, the heart of the transaction, that Bonneville had the authority to sell to the DSIs and Bonneville had the authority to monetize. Not selling to the DSIs. That's the fundamental problem here. It's not selling. And you're coming up and you're justifying in part by justifications that have to do with selling. That if we sell, we have certain advantages but you're not selling. But the, let me see if I can find. What you're saying is that we approved the monetization and we just said the rate was wrong. Yes. I'm not sure. The court's opinion says these, let's see, the aluminum DSI contracts do not under the monetary benefit option involve physical delivery of power. They may nonetheless qualify as, quote, sales of electric power as they are designed to effectuate the delivery of power to the DSIs at a rate agreed upon by the DSIs and BPA by subsidizing the sale of power actually acquired elsewhere. So, the court implicitly approved this process in reducing it to a monetization. That was a very technical question of whether the, and under any circumstances, it would be a sale of power because if it wasn't a sale of power at all, you couldn't do it. But it didn't have to do with whether, and then there's 35 which says there are situations in which BPA's decision to monetize its energy contracts would likely qualify as reasonable. And then we go and we give some examples. But we certainly didn't suggest it was across the board. Well, it, so the court asked some questions of the petitioners about the Columbia Falls record of decision that was a part of this overarching administrative process. And we did set forth some reasons in there, some long-term business justifications for serving Alcoa. And if that's what the court is searching for, more of a business justification for this, then the CFAC rod is there to provide that. Is there anything, and somewhere in the papers, and the papers are so voluminous that I can't put my finger on where, I thought I saw somewhere that the plant was going to be closing down anyway. Alcoa's plant? Right. This particular smelting plant that we're talking about. I don't know, I don't believe that's the case. But I have heard that the Columbia Falls plant perhaps may close, but Alcoa's facility, I don't, I don't know. Does it make any difference to, I mean, suppose this wasn't a nine-month emergency problem. But this was your ultimate justification for a long-term contract under these same terms. Don't you think you'd have to make, I mean, the, the, the, taking into account the Columbia Falls explanation, it's kind of a shorthand, and it summarizes what might be the case, but it doesn't prove anything at all. I mean, in terms of what the historical relationship has been, and why there might be some possibility that, that they would buy at some point. If they're never going to buy power, because you're always going to have this problem with them, and you're always going to want to give them money rather than buying power, then the advantages of buying power are never going to materialize. So don't you have to demonstrate in some fashion, if that's what you're relying on, that there is some reason to think that someday they might, you might be in a position to self-empower, and they might be in a position to buy it? Don't we have to demonstrate that? If that's the rationale. I mean, the rationale, at least in large part, under the, in the CFAC amendment explanation, is there are advantages to having these customers around to buy power from us. I don't, I don't, so I'm going to, I'm going to go back to sort of the, the two, three-step process. I don't think we have to demonstrate that, because we don't demonstrate that with any of the preference customers. We don't say, well, we're going to sell at the preference. You have no choice to sell, but to sell to them. The whole point of our prior opinion is that you can either sell or not sell. That's true. Therefore, you have to have a reason to sell, as opposed to not sell. If you're going to burden the whole overall system with the cost of selling, no. So we, we read the opinion to say, therefore, you have to have a justification. If you're going to sell at them at a rate that is below market and below IP, you need to justify that. If you sell to them at the statutorily authorized rate, then you do not need to go this extra step of going through selling. So, so all of the explanations that you wrote in short, in the short form in the CFAC document don't matter, because you don't need them. Well, if, if, if the court finds that it, it needs to reach that level, then they may matter. But that would be a departure from the way 838G has been used in the Scorch-Gerrish prudence for, for 25 years. It has not been used as a specific showing that Bonneville needs to make whenever it sells electric power to any of its customers. Not to any of its customers. To a customer to whom it doesn't need to sell power. Well, in, in the California Energy Commission case, Bonneville didn't need to. There, there's some question as to how much of an obligation Bonneville had to provide transmission to these folks. So, there, there was discretion at issue in that case. And the court said, well, in this instance, 838G doesn't. Suppose you were to sell power to, let's suppose it wasn't a DSI, to some completely outside customer and, and you otherwise met the requirements of, of supplying all in, in area customers. And you sold it to them at, at, not at a market rate, but at just some other rate. Was there no review of that? There, there's review, but the review is pursuant to the statutorily authorized rate provisions. If we, if we followed the rate provisions for whatever that customer was, then we're doing what Congress and the. But, but you're also in a position about that, is it's whatever rate we negotiate, right? That's where you establish. No. About the FPS rate, no? No, no. That, that's what we had said the first time. And we, we acknowledge that the court very clearly pointed out that it is not whatever rate you negotiate. If there is a specific statutory provision that. But there isn't with regard to out of area people, is there? There isn't what? With regard to out of area people. We, we sell to out of area people under surplus power provisions. Right. And, and the surplus rate is the FPS rate. And the FPS rate is whatever rate we negotiate. That's correct. All right. So I'm back to where I started from. You might be nice if you, I mean, we just waited three minutes getting to where we started from. Therefore, the question is, if you sell it at any rate you want, it's unreviewable. It's your position. The rate, even if it ends up costing everybody else money. It, it is not necessarily unreviewable. The, the presumption is that we have complied with the statutory review. All right. But, and as I said earlier, if you were taking that position with regard to our direct problem here, I can understand it a lot better. But, but you, although you started to say that for about 30 seconds, you keep backing off to this absolutist position. No, I, I, I just, I, I want to stress, it's a two-tier approach. I, I, my first argument is yes, as you said, that, that first absolutist position. The second is that it's a strong presumption that we have complied with sound business principles. If we follow the specific right directions. Well, let's say it's a strong presumption. Then who reviews whether the presumption should be sustained? This court would. All right. So, under what authority is, are we, what are we using as our basis for review? You say we don't want. You're using, you can use 838G, but you might be, you would use it as a standard that applies to all bondables. So, you, you would say, well, yes, this, this statute, or this sale may be, as Judge Berzon characterized, a money losing sale in the short term. But this statute says it's with a view to encouraging the lowest possible rate. So, any action that BPA engages in is going to have an impact on somebody's future rates. And just because bondable may be, quote, losing money on this transaction doesn't mean it runs afoul of 838G. Where in the, where in the record is support for that? How, how can I? It's, it's in this court's case law. That, that, that's directly from. I mean, for the, the, I understand the review, but where is the, where is the facts in the record for me to conclude that to the BPA as a whole, the generic BPA, that paying $32 million to, I'll call it, is a sound business practice? I, I think the, the record would have to, to answer that question. The record would, would include the record on the prior, prior incarnation of this case. Because we, we set forth all sorts of information as to why this could be in BPA's future business interest and why it's consistent with. I don't remember that. What was the reason? It's, it's. I remember a lot of material about how you want to, these were the same reasons we basically went through, as I think, if there are three justifications that we didn't find. And the main justification was a very laudable thing to do, which is to try to keep the jobs in the area. But that was the way it was put. It wasn't put in terms of, of BPA's interest or, or the interest of the customers as a whole. So those justifications, here's, here's the quote from the court that I've been searching for for a while. BPA's three justifications were flawed and incapable of supporting BPA's decision to offer DSIs capped monetized power at a rate below both the IP rate and the market rate. So the justifications didn't support using the wrong rate, but by implication, if we had used the correct rate, justifications were the same. I have nothing, I have nothing. Can I just come back on one thing? Sure. If we take sort of a myopic approach that this was an emergency measure and that we should talk about the standard review of an emergency measure, what in the record shows that time was so short that you had to do this by, essentially, by the beginning of January? Well, there, there are three documents you can look to. The, the two letters, one that went out before the amendment, one that went out just announcing to the region that we had finalized the amendment, and then the amendment itself in its recitals. And there are extensive recitals, several pages at the beginning of the amendment talk about the exigency, that the economy, the potential closing of the alcohol plant, now I'm remembering what, what you were referring to, the potential closing of that plant, alcohol's worldwide layoffs, a number of things, a need to respond to the court's opinion almost immediately, because the contract kept going forward. The court kept the contract alive, so we needed the right rate in it immediately. Didn't you say somewhere along the way that you had some federal financial reason why you had to be able to attest that it was, that the contract was legal, and in light of the contract, you couldn't, in light of the opinion, you couldn't do it, but I, I didn't know what the money was. Oh, right, there was that, there was that as well. So when, when we pay the, the service benefits, the agency has a certifying officer, and there's a federal statute that holds that officer personally liable if they think that there's any shadow of a doubt that paying those, they were over, would be unlawful. There was an argument that, based on our decision, that they were overpaying. Correct. Because they were. Or, or, well, not that they were overpaying, but maybe they shouldn't have been paid at all. But where, is there anything that says that you had to go so fast that Alcoa couldn't pay the market rate for the next several months until there could be full hearings on this? Well, I, I think the documents that, that I mentioned, the two letters, the recitals to the, to the contract itself, all the comments that we received, there were 44 comments that came in in that brief holiday season comment period that we had. All provided some evidence to us that we needed to act quickly. The economy was in dire straits. Okay, I think we have, that's in your briefs, so let's, we're well over time here on, on your time. Thank you for your time. Thank you. Thank you. Again, Mark Thompson with the Public Power Council, or PPC, and PPC is an association of utilities that are all preference customers. In my short time, I would like to address quickly the Bonneville claim that if it sells power at the IT rates, the DSIs, that there's no scrutiny of that decision under the sound business principles. I'd like to touch quickly on the claim that, that there's no law to apply here and then, and briefly go over the justifications that Bonneville did spell out, including those that were in the CFAC record of decision. This court has found in multiple cases that the statutes governing Bonneville's actions are permeated with references to the sound business principles. And in many cases, Bonneville has applied that standard in judging whether or not Bonneville's discretionary actions should be upheld.  What they did acknowledge in their brief is that the contract is subject to review under the Administrative Procedure Act to determine whether or not it's arbitrary and capricious. And in making that inquiry, the court has often looked to the sound business principles standard to inform it in that inquiry. Do you think the sound business principles, would it be useful in trying to give some overall content to that, to look at corporate law with regards to business judgment law? Do you think it's something similar? Well, I think it is something similar and I think it strikes, you know, it's kind of a common sense notion of sound business. And I think that's. It's a very deferential rule, but not absolutely too. Right. And the cases I'd like to point out, it has often been the case that it has increased the deference that the court has given to Bonneville. For example, in the Bell v. BPA case, Public Power Council v. BPA case from 2006, Department of Water Power case, we have all this cited in our brief. And as well as in the APAC case, the court said, well, we're looking at a Bonneville discretionary action and we're going to defer to them in these instances because they seem to be advancing their decision based on a conclusion that it advances their sound business principles mandate. However, you know, Mr. Olive was incorrect, it's not true that the court has never found this principle to be a limiting factor. And the Golden Northwest case decided in 2007, the court found that Bonneville acted in a manner that was arbitrary and capricious when it failed to recalculate its fish and wildlife costs and setting rates. And in that case, the court said Bonneville has a duty to act in accordance with sound business principles and they have to estimate their costs based on sound business principles. And given the change in circumstances, they didn't do that and therefore it's arbitrary and capricious. So I just wanted to point out that connection between the arbitrary and capricious review that Bonneville admits does apply in this case and the sound business principles standard. Quickly, Bonneville makes the case in its brief that there's no law to apply here. The Overton Park case, the Supreme Court case says that there are very rare instances in which there's no law to apply and that the court only determines whether or not there's law to apply based on the specific facts in a given case. And we cited the Strickland v. Morton case in our brief, in our reply brief, that states every statute has some limits capable of being exceeded. In other words, there's no statute that just gives no law to apply. But there maybe they are, courts have held that there are some. The question is, is this one of them? Yes, and so the point I would like to make is that the court will have to look at the sound business principle standard and compare that to an agency which is knowingly incurring a loss or basically nothing in return and say, well, there's no, there's no, the sound business principle doesn't apply. Possibly in the short run incurring a loss, but it can, if it can, if there is no statutory prohibition on spreading the cost-based rate over the preferred customers and the DSIs, then in the long run, it will recover its costs. Is your position ultimately that it can't do that? I mean, didn't Gold Northwest say that it could do that? Gold Northwest said if they have a valid contract with the DSIs, and we have to assume that they did because that was, then in that instance, they have the authority to, they need to collect their costs and they can charge those costs to the preference customers. So the question here is obviously a very different one. Are they authorized and have they justified, made a case that would allow them to justify their payment? Doesn't the need to spread the costs be a basis for saying you can't do it? That's what I'm trying to ask you. Well, you know, our brief does set out our position that, you know, preference does mean something and that Bonneville has, you know, not only. If there's a limited amount of power, then you get it, but that's, but the question is, does it also mean that you have some authority to say even if it were in a sound business judgment, at least to the degree that they could recover costs, that they can't do it? No, I think we make a secondary argument in our brief, which is kind of accepting, okay, if they validly incurred these costs, then they can charge them to us. So long as they have made some sort of showing that they actually do. What I'm asking you is, is the fact that they would have to spread the cost to you in order to maintain sound business principles, a reason for not allowing them to make the contract in the first place. For the court, can the court say, strike down the contract on the ground that in order to make it comply with 830 AG, you would have to spread the cost to you? That is a position that we have advanced in our brief. What is the basis for that position? The basis is that Bonneville has the duty to, a statutory, it gives a statutory duty to give preference to customers, to encourage diversified use, and that selling power to a limited number of private companies in a way that raises our costs is inconsistent with those statutes, with that statute. But I would like to respond to that secondary argument and support that, even if Bonneville, if there's not a flat prohibition against them doing that, they have to have cited some reason why entering into the contract is consistent with sound business principles. As the court already noted, Bonneville didn't offer much by way of justification in the closeout letter, its decision document. They did offer some new justifications with respect to the record of decision that they issued on the CSAC agreement. And this court has said, though, that its inquiry is, while deferential, it is searching and careful. In other words, you can't accept conclusory statements. There has to be some, a story that the court can buy. I just want to briefly recap what those justifications are. First of all, they would like to avoid potential job losses in the region. Now, I have to make the statement that our preference customers feel like they're not even doing that. They're basically balancing preference customer jobs against Alcoa jobs. And there are consumers in our service territories that are losing their jobs due to high power rates. The other justification they give is that Bonneville has to move quickly. There's not much there. In the CFAC record of decision, they stated a conclusory statement. Well, the DSIs have provided great value in the past, and it's, therefore, reasonable to assume that they might again. I think the court needs to look at that. The reason they provide value in the past is because they provided a valuable sink for Bonneville to sell power in. Is that really reasonable to assume that that's going to recur again? There's no showing that that's going to occur. And in fact, as Mr. Olive pointed out, Bonneville just recently signed contracts for 20 years with its preference customers under which the preference customers are obligated to pay for the power from Bonneville even if they end up not taking the power from them. So, there's really no risk that Bonneville is going to be stuck with power and have no place to sell it. Bonneville also says, well, these are nice flat loads, and they don't, they're easy to serve because they take, you know, a similar amount of power in all hours of the day. Well, that's already included in the assessment that this is still going to cost them money. That doesn't change this into a benefit. It just means it's less expensive than it might otherwise be. Finally, they say it's short-sighted to lose DSI loads because we basically might need them around in the future. Again, that's just a speculative argument that for some reason, all of Bonneville's loads could go away, and the only purchaser left would be the direct service industries, and so I think the question for the court is do any of those justifications, even if you do reach them, do they actually tell a story that the court can buy? I'll close counsel argued that if we invalidate the sales, not being sound business practice, the monetization here at the IP rate, then he says it proves too much because you couldn't justify under sound business practices the sales to the preferential customers. Could you respond to that? Sure. Well, I think it was a point that was already hit on by Judge Berzon, which is with regard to sales to the preference customers, it's a different animal. The statute requires a sale, and it specifically states what cost those sales are to be based on. So, Bonneville has no choice. That's clearly spelled out, whereas service to the DSIs does represent a discretionary choice by the agency. Okay. Thank you. Did they have some time left? You're all. Okay, counsel. Thank you all. This has been enlightening, and lightning will strike. The arguments and the case argued is submitted, and we hope you have a good day. Thank you.
judges: Fisher, Berzon, Moskowitz